## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRAD BECKERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. _____ |
| | ) | |
| BACARDI LIMITED, AMERICANA JV | ) | JURY TRIAL DEMANDED |
| INVESTMENTS, INC., BARRY E. | ) | |
| KABALKIN, SCOTT ROADES, | ) | |
| QUADRANT CAPITAL ADVISORS, | ) | |
| INC., ANGEL HOLDINGS, LLC, and | ) | |
| THOMAS BRENER, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Brad Beckerman ("Beckerman"), by and through his undersigned counsel, alleges in his Complaint against Defendants Bacardi Limited ("Bacardi"), Americana JV Investments, Inc. ("Americana"), Barry E. Kabalkin ("Kabalkin"), Scott Roades ("Roades"), Quadrant Capital Advisors, Inc. ("Quadrant"), Angel Holdings, LLC ("Angel Holdings") and Thomas Brener ("Brener") as follows:

## NATURE OF THE ACTION

1.      Beckerman is the founder, CEO and Chairman of Stillhouse, LLC ("Stillhouse" or the "Company").  Stillhouse is an American spirits company that

offers whiskey, bourbon and vodka products in a state-of-the-art stainless steel can.

2.     Under Beckerman's leadership, Stillhouse has become one of the fastest growing and most innovative spirits companies in the United States.  Stillhouse has achieved nationwide distribution for its products, with sales in all 50 states through large retail chains Wal-Mart, Publix, Target, Costco, Walgreens, BevMo, Meijer and Total Wine & More, among many others.  In 2017, Beckerman brought in major hip-hop artist and celebrity G-Eazy as an investing partner and Co-Creative Director.  In 2018, Stillhouse shipped nearly 50,000 (nine liter) cases and is on pace to ship over 70,000 (nine liter) cases in 2019.  Stillhouse also recently obtained, and has pending, valuable patents and trademarks relating to its innovative packaging.  In total, the Company, as admitted by Bacardi just weeks ago, is worth in excess of $100 million.

3.     Bacardi convinced Beckerman to provide it inside access and control of Stillhouse through a series of false representations and promises of support.  To induce Beckerman to relinquish majority ownership and control of Stillhouse, Bacardi represented to Beckerman that it would in the future bring Stillhouse "in house," by buying all of the equity of Stillhouse, including Beckerman's, at a fair market price.

4.     In the meantime, Bacardi promised Beckerman that Bacardi, along with Quadrant, would fund Stillhouse as Stillhouse aggressively spent money on marketing and production.  Bacardi also promised to act as a partner of Beckerman's.  These commitments were critical because by providing a stranglehold over the operations of

2

Stillhouse to Bacardi, the ability of the Company to find alternative sources of financing would be significantly impaired.

5.      Based on these and other promises, Beckerman agreed to amend the Operating Agreement (defined below), which substantially diluted his interest in Stillhouse.  Included in the Operating Agreement are call rights, to be exercised in three or five years, which set forth a valuation procedure to be employed when Bacardi exercised its right to buy all of the shares of the Company.  The Operating Agreement also includes supermajority and board rights that allow Bacardi to block almost any meaningful transaction contemplated by the Company.

6.      The period for Bacardi to exercise its first call right was between February 4, 2019 and March 6, 2019 (the "First Call Period").  In the months leading up to this date, Stillhouse achieved record breaking success.  By any metric, the Company had never been stronger.

7.      However, Defendants got greedy.  Rather than pay the fair price to Beckerman and others for Stillhouse under the valuation process agreed to in the Operating Agreement, they schemed to take the Company on the cheap.  In the months leading up to the First Call Period, Defendants inexplicably, and in contravention to their prior commitments, cut off funding for the Company.

8.      When Beckerman asked Defendants to keep their word and fund the Company, they said they would only fund the Company *if* Beckerman and others

agreed to sell their interests in Stillhouse to Bacardi at a below market rate.  When Beckerman tried to obtain alternative financing or to sell the Company at a fair price, Bacardi used its broad rights under the Operating Agreement to block these efforts. Indeed, another member of Stillhouse agreed to step up and provide Stillhouse the working capital it needed, but Bacardi said no.

9.     In a recent email, Bacardi admitted that "Stillhouse faces critical funding needs, and that they are very time sensitive" but "Bacardi will not be willing to provide additional funding unless and until a deal is completed or very near completed."  The deal referred to in this email is the take it or leave it offer Bacardi made to all of the equity holders, including Beckerman, to sell their interests in Stillhouse at substantially below market value.

10.    The effect of Defendants' wanton scheme has been catastrophic to Beckerman personally.  Because of Defendants' malfeasance, Beckerman has suffered damages in excess of $100 million.  Because of the egregiousness of the conduct, punitive damages are also appropriate.

## PARTIES, JURISDICTION AND VENUE

11.    Brad Beckerman ("Beckerman") is the founder, CEO and Chairman of Stillhouse.  Beckerman is a California resident.  Beckerman is an entrepreneur who has created innovative companies and brands across many industries.

12.    On information and belief, Defendant Bacardi Limited ("Bacardi") is a

Bermuda private company that, directly or indirectly, owns and controls Americana JV Investments, Inc.

13.     Defendant Americana JV Investments, Inc. ("Americana") is a Delaware corporation that, on information and belief, is, directly or indirectly, owned and controlled by Bacardi.  Americana is the largest equity holder in Stillhouse and also is its largest lender.

14.     Defendant Barry E. Kabalkin ("Kabalkin") is the Vice Chairman of Bacardi.  Kabalkin has attended some meetings of the Board of Managers of Stillhouse.  On information and belief, Kabalkin is a Maryland resident.

15.     Defendant Scott Roades ("Roades") is an executive and an in-house counsel of Bacardi and is also the General Counsel of Americana.  Roades sits on the Board of Managers of Stillhouse as a Bacardi representative.  On information and belief, Roades is a Florida resident.

16.     Defendant Quadrant Capital Advisors, Inc. ("Quadrant") is a New York corporation with its principal place of business in New York, New York.

17.     Defendant Angel Holdings, LLC ("Angel Holdings") is a New York limited liability company with its principal place of business in New York, New York. Angel Holdings is owned and controlled by Quadrant, either directly or indirectly.

18.     On information and belief, Defendant Thomas Brener ("Brener") is a New York resident.  He sits on the Board of Managers of Stillhouse as a Quadrant

representative.

19.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

20.     This Court is a proper venue pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this forum.

## FACTUAL ALLEGATIONS

### A.     Stillhouse Clear Whiskey, Black Bourbon and Classic Vodka

21.     Stillhouse is a producer of award-winning clear whiskey, black bourbon and vodka products.

22.     For its clear whiskey, Stillhouse offers an unflavored Original Whiskey and flavored products Spiced Cherry Whiskey, Apple Crisp Whiskey, Peach Tea Whiskey, Coconut Whiskey and Mint Chip Whiskey.

23.     Stillhouse's Spiced Cherry Whiskey won best new product for 2017 by *Beverage Industry* magazine, beating out a rival product from Jim Beam.

24.     Stillhouse's Black Bourbon is barrel-aged, charcoal filtered and mellowed in roasted coffee beans.

25.     Black Bourbon won best new product for 2018 by *Beverage Industry* magazine receiving 67% of the vote.

26.     Stillhouse recently released Classic Vodka, which is made from 100% estate grown corn and filtered through American sugar maple charcoal.

**B.     The Stillhouse "Unbreakable" Can**

27.     Stillhouse is disrupting the American spirits market by offering its clear whiskey, black bourbon and classic vodka products in an innovative, functional and visually impactful steel can (the "Stillhouse Can").

28.     The can, shown below, has won numerous awards, including Double Gold at the prestigious San Francisco World Spirits Competition and Gold at the prestigious New York World Wine & Spirits Competition.



29.     The Stillhouse Can is not only visually impactful; it has functional

appeal.  Glass can break and shatter, but the Stillhouse Can is "unbreakable."  It goes where glass cannot, such as on a hike, at a tailgate, or at music festivals.

30.     The Stillhouse Can chills faster and stays cold longer than glass.  A nine liter case takes up about half of the shelf or inventory space than glass, making it achieve a higher margin per square foot in a retail store.

31.     The Stillhouse Can is eligible for patent protection.  Stillhouse has filed an application with the United States Patent & Trademark Office.  Stillhouse is likely to receive a U.S. patent soon.

32.     Stillhouse also owns multiple design trademarks for the Stillhouse Can (U.S. Reg. Nos. 4,983,766, 4,983,811, 5,495,019 and 5,580,358), among other valuable trademarks, such as the brand STILLHOUSE (U.S. Reg. Nos. 3,795,170, 3,949,272, 5,018,478 and 5,186,916).

33.     Stillhouse also recently obtained a Chinese patent for its "pour spout," with U.S. patents pending.

## C.     Stillhouse Grows Rapidly and Experiences Record-Breaking Sales

34.     Stillhouse began selling its clear whiskey in the Stillhouse Can in February 2016.  In just under three years, Stillhouse went from an upstart to a company with nationwide distribution and sales in all 50 states.

35.     Today, Stillhouse's clear whiskey and black bourbon products are sold in the nation's largest retailers, including Wal-Mart, Publix, Target, Costco, Walgreens,

Meijer and Total Wine & More, among many others.

36.     2018 was a record-setting year for the company.  In 2018, Stillhouse shipped just under 50,000 (nine liter) cases or case-equivalents, representing a 23% increase over shipments in 2017.  Shipments represent sales from Stillhouse to liquor distributors.

37.     Roughly 42,000 (nine liter) cases of Stillhouse were depleted in 2018, a 32% increase over depletions in 2017.  Depletions represent sales from liquor distributors to retailers.

38.     December 2018 was the best month in company history, with over 6,600 (nine liter) cases depleted in just one month.  Sales were up in all major regional markets across the country, including Florida, New York , California and Illinois.

39.     Stillhouse also has massive potential in global markets.  In 2018, Stillhouse went from basically no international sales to 2,000 (nine liter) cases in duty free stores and cruise lines.  Stillhouse has achieved commitments from duty free airport shops, major cruise lines and shops serving border areas.

40.     Apart from the Stillhouse Can and the award-winning whiskey inside, Stillhouse' growth is due in part to its partnership with hip-hop artist G-Eazy.

41.     G-Eazy is a major hip-hop artist and high-profile celebrity who has released multiple platinum albums (an album reaches platinum status when it sells one million copies).  In 2018, G-Eazy's songs were streamed one billion times by users in

65 countries around the world.

42.     G-Eazy is not just a critically acclaimed and successful musician; he is also a fashion and style icon.  With 7.7 million followers on Instagram, 2 million followers on Facebook and 3.6 million followers on Twitter, G-Eazy has a massive audience who visit his social media pages for inspiration on music, fashion and lifestyle.

43.     For Stillhouse, G-Eazy is not merely a celebrity promoter.  G-Eazy is an investing partner who, by virtue of his investment, owns a significant equity position in the company.  G-Eazy also serves as the Co-Creative Director for Stillhouse.  He is committed to the company and believes in its products.

**D.     The Classic Vodka Launch**

44.     Vodka is the largest spirits category in the United States with over 70 million cases consumed in 2016.   Based on conversations with Stillhouse's distributors and Stillhouse's own market research, Beckerman determined that there was massive growth potential if Stillhouse offered vodka in the Stillhouse Can.

45.     To capitalize on this opportunity, Stillhouse developed a vodka product, branded Classic Vodka.

46.     Stillhouse has built considerable market momentum for the launch of Classic Vodka.  Distributors have already placed orders for 10,000 (nine liter) cases, including commitments from Wal-Mart, Albertsons, Vons, Pavilions, BevMo to name

a few.

47.     Stillhouse has been conducting taste tests to prove that its vodka is better than the competitive set.  In a recent taste test conducted by Stillhouse's distributor, Class Vodka beat out its rivals.

48.     On March 1, 2019, People.com—a website with over 43 million unique views per month—published an article about Stillhouse and its launch of Classic Vodka.  The response from the industry and consumers has been overwhelming.  One of the largest U.S. distributors told Beckerman that Classic Vodka has "big winner written all over it."

49.     Stillhouse just won a Silver Medal for its Classic Vodka from the prestigious San Francisco Global Spirits Awards, beating out well-known and established vodka brands.

**E.     Stillhouse Is Worth Over $100 Million On The Open Market**

50.     In the spirits business, companies are priced based on their case volume sales.  This is because strategic buyers, such as Bacardi, can bring the spirits brand "in house" and generate profits by using their already existing sales and marketing teams to sell the products.

51.     Stillhouse sold just under 50,000 (nine liter) cases in 2018, and is on pace to sell over 70,000 (nine liter) cases in 2019.  In addition, Stillhouse already has distribution in major retail stores, such as Wal-Mart—which gives Stillhouse prime

placement, such as end cap space, in many of its retail stores.

52.     Based on these factors, Stillhouse is worth well over $100 million on the open market today.  For context, Constellation Brands recently acquired High West Distillery for $160 million.  High West's portfolio, which includes four core products, sold about 70,000 cases annually at the time of the acquisition.  Stillhouse is on pace to exceed those sales.  In addition, Casamigos was recently acquired by Diageo at a $1 billion valuation.  At the time of the acquisition, Casamigos was selling under 100,000 (nine liter) cases annually.

53.     Bacardi admits that Stillhouse is worth over $100 million.   Roades recently told Beckerman that Bacardi would not approve a sale of Stillhouse to a third party for under $100 million.

**F.      The Bacardi and Quadrant Investments**

54.     Beckerman founded Stillhouse in 2009 as a moonshine spirits company. Stillhouse originally sold its moonshine in a glass jug.

55.     In 2013, Beckerman came up with the idea of creating whiskey products sold in an innovative steel can.

56.     In 2014, Beckerman sought to raise capital for this idea by offering a minority equity position in Stillhouse.  He pitched the opportunity to multiple potential investors.  Bacardi was one of the potential investors.

57.     Beckerman spoke directly with Kabalkin, the Vice Chairman of Bacardi,

regarding the potential investment in 2014.  Kabalkin was blown away by the idea.

58.    Kabalkin told Beckerman that Bacardi's business model is to place bets on entrepreneurs with the intention of bringing the brand "in house" at a later date. Kabalkin told Beckerman that Bacardi would make a small investment initially, and that as potential for the brand is shown, Bacardi would invest more money before eventually taking the brand "in house."  By "in house," Kabalkin meant that Bacardi would acquire ownership and control over the brand STILLHOUSE and sell its products alongside Bacardi's suite of spirits brands.

59.    Kabalkin also told Beckerman that Bacardi would operate as a "strategic partner" rather than merely a passive investor.  This was valuable to Beckerman, as he knew Stillhouse would benefit from working with a strategic partner like Bacardi.

60.    On these representations, Beckerman decided not to pursue the other interested investors and allowed Bacardi to invest.  Bacardi provided an initial bridge loan, and then invested $2 million in exchange for shares of Stillhouse common equity.  Bacardi invested at a pre-money company valuation of over $12 million.

61.    With this investment, Bacardi became a minority equity owner in Stillhouse.  Beckerman still owned and controlled Stillhouse as its largest equity owner, but his interest in Stillhouse was diluted as part of this deal.

62.    In 2015, Beckerman sought to raise additional capital for Stillhouse. Bacardi was willing to invest.  Bacardi also brought in Quadrant as an additional

investor.

63.     Beckerman negotiated the terms for this additional investment with Kabalkin, Roades and Hector Ortiz of Bacardi.  During these negotiations, Kabalkin again told Beckerman that it was Bacardi's plan to take Stillhouse "in house."

64.     To that end, Bacardi insisted on obtaining "call rights" that would permit Bacardi to force the other members of Stillhouse to sell their equity to Bacardi. Bacardi wanted two "call rights," with one exercisable in two years and another exercisable in four years.

65.     Beckerman told Kabalkin that he was concerned that the two-year call right would allow Bacardi to take Stillhouse "in house" before Stillhouse had reached its full potential.  Beckerman told Kabalkin that this two-year call right did not create enough protection for him.

66.     To address Beckerman's concerns, Bacardi agreed to give Beckerman an additional year for each "call right," with the first call right exercisable in three years and another exercisable in five years.  And Bacardi agreed to give Beckerman additional compensation in the form of a percentage of the difference in company value between the first and second call rights.

67.     Beckerman also raised concerns about giving up control of his company. During the 2015 negotiations, Bacardi demanded that it receive "supermajority" rights that would prevent the company from taking major actions without Bacardi's

approval.    Bacardi also demanded that Quadrant also receive the same "supermajority" rights.

68.    To allay Beckerman's concerns, Kabalkin told Beckerman that Bacardi still intends to take the Stillhouse brands "in house" and will pay Beckerman fair value for his membership interests when Bacardi does so.

## G.    <u>The Operating Agreement</u>

69.    The parties reached an agreement which is memorialized in the Fourth Amended and Restated Limited Liability Company Operating Agreement of Stillhouse, LLC ("Operating Agreement") dated October 19, 2015.

70.    The Operating Agreement created three classes of membership units: Class A Common Units; Class B Common Units; and Profits Interests Units.

71.    Generally, the Class A Common Units are owned by Beckerman and the other original investors in Stillhouse.

72.    The Class B Common Units are generally owned by later stage investors, primarily Bacardi and Quadrant.  Pursuant to the Operating Agreement, and a Contribution and Subscription Agreement dated October 19, 2015, Bacardi, through Americana, invested $2.4 million to acquire 7,001,360 shares of Class B Common Units, and Quadrant, through Angel Holdings, invested $2.6 million to acquire 3,127,308 of Class B Common Units.  Bacardi's original $2 million investment was converted into Class B Common Units.

73.   The Profits Interests Units are predominantly owned by Stillhouse employees, contractors and managers as incentive compensation.

74.   Beckerman owns both Class A Common Units and Profits Interests Units.  On a fully diluted basis, Beckerman owns roughly 17% of the outstanding equity in Stillhouse today.

75.   Bacardi, through Americana, owns over 50% of the Class B Units.  On a fully diluted basis, Bacardi, through Americana, owns roughly 36% of the outstanding equity in Stillhouse today.

76.   Quadrant, through Angel Holdings, owns roughly 38% of the Class B Units.  On a fully diluted basis, Quadrant, through Angel Holdings, owns roughly 24% of the outstanding equity in Stillhouse today.

77.   Stillhouse is managed by a Board of Managers (the "Board").  Pursuant to the Operating Agreement, Beckerman remained Chairman of the Board.  Bacardi has the right to appoint two of the six Managers on the Board, and Quadrant has the right appoint one Manager.  Roades is the Bacardi-appointed Manager currently on the Board.  Brener is the Quadrant-appointed Manager currently on the Board.

78.   Even though Bacardi and Quadrant control two of the five seats currently filled, Bacardi and Quadrant control the Board pursuant to their "supermajority" rights granted in the Operating Agreement.

79.   Pursuant to Section 7.4(b) of the Operating agreement, Stillhouse must

obtain the "affirmative vote" of at least one Bacardi-appointed Manager and the Quadrant-appointed Manager to take twenty-one specified actions.

80.     For example, Stillhouse must obtain the affirmative vote of Roades and Brener to (1) approve an annual budget, (2) borrow money, (3) raise money through equity financing, and (4) enter into new lines of business, among other actions.

81.     Bacardi's "call rights" are set forth in Section 9.8 of the Operating Agreement.  Bacardi's First Call Right is set forth in Section 9.8(a), which states in relevant part:

> Following the third (3rd) anniversary of the Commercial Introduction of the Company's product, Bacardi (directly or through one of its Affiliates) shall have the right and option, exercisable in its sole discretion, to elect to purchase for cash all of the Units then held by the other Members by delivering written notice to the other Members within thirty (30) days of such anniversary (the "Bacardi First Call Notice"), and the other Members shall be obligated to sell such Units to Bacardi (or its designated Affiliates) (the "Bacardi First Call Right"). . . . The purchase price to be paid by Bacardi (or its designated Affiliate) for the Units acquired pursuant to the Bacardi First Call Right shall be calculated based upon the fair market value of the Company determined using the Valuation Process described under Section 9.10 hereof.

82.     The Commercial Introduction referred to in Section 9.8 occurred on February 4, 2016.  The Bacardi First Call Right became exercisable on February 4, 2019, and expired on March 6, 2019.

83.     The Bacardi Second Call Right, as set forth in Section 9.8(c), is exercisable five years after Commercial Introduction.  The Bacardi Second Call Right will not be exercisable until February 4, 2021.

17

84.     The Valuation Process, as set forth in Section 9.10, requires Bacardi, Quadrant and Beckerman to first negotiate in good faith to reach an agreement on the "fair market value" of Stillhouse.  If those negotiations fail, Bacardi, Quadrant and Beckerman must submit a final valuation proposal.  If the average of the two highest valuations differ by 15% or less from the lowest valuation, the fair market value of the Stillhouse is calculated by averaging the three valuations.  If the average of the two highest valuations differ by more than 15% from the lowest valuation, then the parties shall engage a mutually agreed upon investment banking firm of national reputation with experience in the alcoholic beverage industry to determine the "fair market value" of Stillhouse.

85.     Bacardi also has a Right of First Refusal, in Section 9.5(c), that gives Bacardi the right to match any bona fide offer from a third party seeking to acquire all of the Membership Units of Stillhouse or all or substantially all of Stillhouse's assets.

86.     The Bacardi Call Rights and the Right of First Refusal effectively prevent Stillhouse from being shopped on the open market.  Beckerman agreed to give Bacardi these rights with the understanding, based on Bacardi's promises, that Bacardi would take Stillhouse "in house" and would pay Beckerman fair value for his equity.

**H.     Defendants Loaned Stillhouse Money They Knew Could Not Be Repaid**

87.     When they invested, Bacardi and Quadrant knew that Stillhouse was in a growth phase and needed capital to compete with established brands.   Bacardi and

Quadrant knew that Stillhouse needed to invest in product development, marketing and advertising at the expense of making profits.

88.    Bacardi and Quadrant agreed that the goal for Stillhouse was to grow the company into a major spirits company that can compete with established, well-known brands by forgoing short-term profits in pursuit of long-term profitability and value.

89.    Despite its representations that it would act as a "strategic partner," Bacardi has basically done nothing but fund development.  Bacardi has not provided meaningful support for sales and marketing strategies.  It has left all of these tasks in the hands of Beckerman.

90.    As Beckerman has grown the business, Bacardi and Quadrant have been willing to contribute additional capital in exchange for additional Class B Common Units, either through capital contributions or convertible loans.  Bacardi has done so consistent with Kabalkin's representations to Beckerman that Bacardi will fund Stillhouse's operations before taking the company "in house."

91.    In March 2018, Bacardi, through Americana, loaned $3.6 million and Quadrant, through Angel Holdings, loaned $2.4 million to Stillhouse (the "March Convertible Loans").  These convertible loans were secured by a first priority lien and security interest in the assets and property of Stillhouse, including certain intellectual property.

92.    The March Convertible Loans were short-term loans.  Bacardi and

Quadrant made the March Convertible Loans knowing that Stillhouse would not be able to repay them when due. Bacardi and Quadrant even approved Stillhouse budgets that did not contemplate repayment of the March Convertible Loans. The approved budgets called for Stillhouse to reinvest in marketing, advertising, promotion and product development.

93.     In October 2018, Bacardi and Quadrant agreed to loan an additional $6 million. Each entered into a Secured Convertible Promissory Note with Stillhouse (the "October Convertible Loans") in which Bacardi agreed to lend up to $3.6 million and Quadrant agreed to lend up to $2.4 million.

94.     The loans made pursuant to the October Convertible Loans all have the same maturity date of May 1, 2019. Like the March Convertible Loans, Bacardi and Quadrant knew that Stillhouse would not be able to repay the loans when they came due. Bacardi and Quadrant continued to approve budgets that did not contemplate repayment of the October Convertible Loans. The approved budgets called for Stillhouse to reinvest in marketing, advertising, promotion and product development.

## I.     **Bacardi and Quadrant Conspire to Cram Down Beckerman**

95.     Bacardi wants to take Stillhouse "in house," but, motivated by greed, Bacardi does not want to pay Beckerman and the other equity owners fair value.

96.     To cram down Beckerman, Bacardi is executing a scheme to render Stillhouse insolvent if Beckerman does not agree to give away all of the assets of

Stillhouse to Bacardi essentially for free.   Quadrant has agreed to join Bacardi's scheme because Quadrant has reached a "side deal" with Bacardi whereby Bacardi has agreed to ensure that Quadrant obtains a full return of its investment.

97.    The "side deal" is evidenced not just by the conduct described herein, but also by comments made by Bacardi.   Bacardi admits that it is having separate conversations with Quadrant.   In those talks, Bacardi has asked Quadrant to go along with Bacardi's plan to "cram down" the other members, including Beckerman.

98.    One component of Bacardi and Quadrant's unlawful scheme was to create a short-term liquidity crisis.   On December 16, 2018, Quadrant informed Stillhouse that it would not fund its $240,000 pro rata share of the $600,000 needed to fund operations for December.   Quadrant failed to provide adequate notice for its refusal to fund.   What is more, Quadrant told Beckerman that it would not fund as he was going in for back surgery.

99.    After Quadrant refused to fund its share, Bacardi then reneged on its promise to fund $720,000 towards the launch of Classic Vodka.   In an e-mail dated November 1, 2018, Roades confirmed that Bacardi would fund its pro rata share of the $1.2 million needed to fund the vodka launch.   But after Quadrant refused to fund its $240,000 share, Bacardi informed Beckerman that Bacardi would not fund as promised.   Bacardi's refusal to fund jeopardized the vodka launch.

100.    To further squeeze Beckerman, Roades then tried to block and delay

purchase orders from Wal-Mart for Stillhouse Classic Vodka.  Roades asked Pete Carr

("Carr"), President of Bacardi's North American operations, to tell Stillhouse's Wal-

Mart buyer to delay or cancel Wal-Mart's vodka orders.  Roades recently admitted

during a recent Board meeting that he asked Carr to contact Stillhouse's Wal-Mart

buyer regarding Stillhouse's Classic Vodka launch.

101.    Another component of Bacardi and Quadrant's unlawful scheme was to

block Stillhouse from obtaining alternative sources of financing or pursuing a sale of

the Company at fair market value.  Stillhouse retained an investment banking firm to

raise equity, but the firm informed Stillhouse that funding could not be obtained

unless Bacardi waived its First Call Right and both Bacardi and Quadrant agreed to

extend the maturity date on the Convertible Notes.  Bacardi and Quadrant refused to

cooperate, thereby blocking Stillhouse's efforts to raise equity.

102.    To get Stillhouse out of the liquidity crisis Bacardi and Quadrant created,

one of Stillhouse's Managers offered to fund company operations for six months

while the company searched for a buyer.  Bacardi vetoed this as well.  By creating a

short-term liquidity crisis and blocking alternative sources of financing, Bacardi and

Quadrant have essentially a death grip on Stillhouse.

103.    With the death grip in place, Bacardi has put a take-it-or-leave-it offer to

the Board.  Bacardi's offer is for Stillhouse to transfer all of its assets to Bacardi for

no upfront payment to the company or to any of the minority members, including

Beckerman.  For the minority members, Bacardi has offered payments that are contingent upon Stillhouse reaching certain case volume thresholds and would not be paid out until at least five years from now.

104.   Bacardi's offer is unreasonable and extortionate.  Essentially, Bacardi is offering Beckerman a take-it-or-leave-it offer to give up his equity for no cash payment and only a potential for some compensation years from now at a fraction of the fair value of Beckerman's equity.  In addition, if Bacardi wanted the Company, as it clearly does, there was an agreed upon procedure in the Operating Agreement for it to take it.  Bacardi and Quadrant have wrongfully chosen to circumvent the First Call Right to take Stillhouse's assets on the cheap.

105.   Bacardi has told the Board that it will not fund going forward, and that the only option is for the Board to accept Bacardi's unreasonable offer.  In doing so, Bacardi is essentially making the Board negotiate with a gun to its head.

106.   In a recent e-mail, Roades admitted, on behalf of Bacardi, that "Stillhouse faces critical funding needs, and that they are very time sensitive." Roades admits that "time is of the essence" but states that "Bacardi will not be willing to provide additional funding unless and until a deal is completed or very near completed."

107.   In the event Beckerman says no, Defendants admit their plan is to get these assets on the cheap, through an asset sale or bankruptcy.  They believe, one way

23

or the other, they will figure out a way to get Stillhouse at a below market price through their scheme to deprive the Company of routine financing.

108.   Defendants' cut-off-the-funding strategy is reckless and has significantly harmed the business of Stillhouse.  Despite obtaining record results in the last few months, Stillhouse will soon be forced to lay off its entire workforce except those necessary to wind down operations.  Stillhouse's can supplier has stopped all production of the cans and other related items.  Stillhouse's relationship with Wal-Mart and other retailers is in jeopardy.

109.   But Bacardi is gambling that Stillhouse can weather the storm because, once it takes the Company, it can use Bacardi employees and production to support the Company, and it can rely on its own relationships with retailers to get the distribution it needs.  And if the strategy backfires, Bacardi is happy to take the tax deduction and write off its losses.  In fact, Kabalkin said that, for Bacardi, its investment is just a "rounding error" if things do not work out.

110.   But for Beckerman, it is not a "rounding error."  This company has been his life's work for the past decade.  And he built it into a $100+ million brand that still has massive growth potential.

111.   Because of the misconduct of Defendants, Beckerman must now resort to litigation to protect his interests.  Defendants have caused him personal damages in excess of $100 million.

## **FIRST CAUSE OF ACTION**

### **Breach of the Implied Covenant of Good Faith and Fair Dealing**

(Against All Defendants)

112.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

113.   In every contract, there is an implied covenant of good faith and fair dealing that requires all contracting parties to operate in good faith towards one another.  When a contracting party possesses a discretionary contractual right, the implied covenant of good faith and fair dealing requires the party to exercise its discretionary contractual right reasonably and in good faith.

114.   Americana is a party to the Operating Agreement as a Member of Stillhouse.  Bacardi is also a party to the Operating Agreement as an Affiliate of Americana.

115.   Defendants Bacardi and Americana breached the implied covenant of good faith and fair dealing by (1) exercising their option not to invoke the Bacardi First Call Right in bad faith and with the intent of avoiding the valuation process that was agreed upon and set forth in Section 9.10 of the Operating Agreement, (2) invoking the Bacardi Right of First Refusal in Section 9.5(c) of the Operating Agreement with the intent to block Stillhouse's efforts to raise equity financing so that Bacardi could acquire the assets of Stillhouse on the cheap, (3) invoking the Bacardi

Right of First Refusal in Section 9.5(c) of the Operating Agreement to block a Manager's offer to fund Stillhouse while it seeks a third-party buyer so that Bacardi could acquire the assets of Stillhouse on the cheap, and (4) executing a scheme to cram down Beckerman and the other minority members, among other breaches.

116.   Quadrant and Angel Holdings aided and abetted the breaches of the implied covenant by Bacardi and Americana by abruptly withholding funds and, upon information and belief, entering into a side deal with Bacardi with the intent to create a liquidity crisis so that Bacardi can cram down Beckerman and take the assets of Stillhouse on the cheap.

117.   If, in the alternative, Bacardi is not a party to the Operating Agreement, Bacardi aided and abetted the breaches of the implied covenant by Americana by causing Americana to (1) renege on its commitment to fund it share of the vodka launch, (2) block or delay Wal-Mart vodka orders, (3) exercise its option not to invoke the First Call Right and (4) invoke the Right of First Refusal all with the intent to cram down Beckerman and take the assets of Stillhouse on the cheap.

118.   Defendants Kabalkin, Roades and Brener aided and abetted Bacardi breaches of the implied covenant through purposefully and knowingly providing support for Bacardi's scheme for their own gain.

119.   Beckerman has duly performed all terms and conditions required to be performed by him under the Operating Agreement, except to the extent his

performance was prevented or excused.

120.   As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered compensatory damages in an amount to be to proven at trial but currently estimated to be over $17 million.

## SECOND CAUSE OF ACTION

### Interference with Contract

(Against Bacardi Limited)

121.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

122.   If, in the alternative, Bacardi is not a party to the Operating Agreement, Bacardi intentionally interfered with Beckerman's rights under the Operating Agreement.

123.   Bacardi knew of the Operating Agreement, the terms therein and Beckerman's rights thereunder.

124.   Bacardi intentionally interfered with Beckerman's rights under the Operating Agreement by causing Americana (1) renege on its commitment to fund it share of the vodka launch, (2) block or delay Wal-Mart vodka orders, (3) exercise its option not to invoke the First Call Right and (4) invoke the Right of First Refusal all with the intent to cram down Beckerman and take the assets of Stillhouse on the cheap.

125.   Beckerman has been damaged by Bacardi's intentional interference in an amount that will conform to proof at trial, but is currently estimated to be in excess of $17 million.

126.   Bacardi's actions were taken with intent to harm Plaintiff.  Its conduct was despicable, malicious, wanton, fraudulent, oppressive and committed with a conscious disregard of Plaintiff's rights.  Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Bacardi and make an example of it.

## THIRD CAUSE OF ACTION

### Fraud

(Against Bacardi Limited, Americana JV Investments, Inc. and Kabalkin)

127.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

128.   Kabalkin, on behalf of Bacardi and Americana, made numerous misrepresentations of fact to Beckerman to induce him to cede control of Stillhouse to Bacardi, including (1) that Bacardi would bring Stillhouse "in house," (2) that Bacardi would provide initial money up front and then contribute additional funding until Bacardi decided to bring Stillhouse "in house" and (3) that Bacardi would operate as a "strategic partner."

129.   Kabalkin made these misrepresentations to Beckerman in 2014 and in the

Summer and Fall of 2015 prior to the execution of the Operating Agreement.

130.   Kabalkin made these misrepresentations to Beckerman with the contemporaneous knowledge and intent that Bacardi would not bring Stillhouse "in house," would withhold funding, would not act as a strategic partner and would seek to orchestrate a scheme to cram down Beckerman and forcibly take the assets of Stillhouse on the cheap.

131.   Subsequently, Kabalkin made multiple other assurances to Beckerman that Bacardi would take Stillhouse in house and that Bacardi believed in and would continue to fund Stillhouse up through the time it decided to take the Company in house.

132.   Kabalkin made these misrepresentations intending that Beckerman would detrimentally rely on them by relinquishing his majority ownership and control of Stillhouse and remain passive under the belief that Bacardi would do the right thing and pay Beckerman fair value when Bacardi decided to take the Company "in house." Beckerman actually and reasonably relied on these misrepresentations.

133.   Kabalkin made these misrepresentations of fact on behalf of, and for the benefit of, Bacardi and Americana, and therefore Bacardi and Americana are liable for Kabalkin's fraud.

134.   Beckerman has been damaged as a result of Defendants' fraud in an amount that will conform to proof at trial but is currently estimated to be in excess of

$100 million.

135.   Defendants' actions were taken with intent to harm Plaintiff.   Their conduct was despicable, malicious, wanton, fraudulent, oppressive and committed with a conscious disregard of Plaintiff's rights.   Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and make an example of them.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

(Against Bacardi Limited, Americana JV Investments, Inc. and Kabalkin)

136.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

137.   Kabalkin, Bacardi and Americana expected to profit from Beckerman relinquishing majority ownership and control of Stillhouse, and they therefore owed Beckerman a pecuniary duty to provide accurate information.

138.   Kabalkin, on behalf of Bacardi and Americana, supplied false information to Beckerman, including (1) that Bacardi would bring Stillhouse "in house," (2) that Bacardi would provide initial money up front and then contribute additional funding until Bacardi decided to bring Stillhouse "in house" and (3) that Bacardi would operate as a "strategic partner."

139.   Defendants failed to exercise reasonable care in obtaining and

communicating this information to Beckerman.

140.   Kabalkin made these representations on behalf of, and for the benefit of, Bacardi and Americana, and therefore Bacardi and Americana are liable for Kabalkin's negligent misrepresentation.

141.   Beckerman    actually    and    reasonably    relied    on    Kabalkin's misrepresentations by relinquishing his majority ownership and control of Stillhouse in the Operating Agreement.

142.   Beckerman has suffered a pecuniary loss as a result of Defendants' misrepresentations in an amount that will conform to proof at trial but is currently estimated to be in excess of $100 million.

143.   Defendants' conduct was despicable, malicious, wanton, fraudulent, oppressive and committed with a conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and make an example of them.

## FIFTH CAUSE OF ACTION

### Breach of Fiduciary Duty

(Against Bacardi Limited, Americana JV Investments, Inc., Quadrant Capital Advisors, Inc. and Angel Holdings, LLC)

144.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

145.   Americana and Angel Holdings are lenders in control of Stillhouse.  As such, they owe fiduciary duties to Beckerman and the other minority members of Stillhouse to act in their best interests.

146.   To fulfill their fiduciary duties, Americana and Angel Holdings have a legal obligation to act loyally and reasonably in Beckerman's best interests, to avoid conflicts of interests and to disclose any information to Beckerman that would materially impact his rights.

147.   Americana and Angel Holdings breached their fiduciary duties by (1) lending money to Stillhouse through the March Convertible Loans and the October Convertible Loans knowing that Stillhouse cannot repay so that Defendants could take the assets of Stillhouse and wipe out Beckerman's equity, (2) approving budgets that did not contemplate repayment of the March Convertible Loans or the October Convertible Loans thereby giving the false impression that Defendants would convert the unpaid amounts into equity but then threatening to foreclose on the assets of Stillhouse so that they could take the assets of Stillhouse and wipe out Beckerman's equity, (3) blocking efforts to sell Stillhouse on the open market or raise equity financing to force Stillhouse to transfer all of its assets to Defendants and thereby wipe out Beckerman's equity, (4) vetoing a Manager's proposal to fund Stillhouse while the company seeks a third-party buyer so that Defendants could take the assets of Stillhouse and wipe out Beckerman's equity, among other breaches.

148.   Bacardi and Quadrant aided and abetted the breaches of fiduciary duty committed by Americana and Angel Holdings by intentionally providing assistance and support to them so that Bacardi and Quadrant could benefit from taking the assets of Stillhouse on the cheap and wiping out Beckerman's equity.

149.   Beckerman has been damaged as a result of Defendants' breaches of fiduciary duty in an amount to be to proven at trial but currently estimated to be over $17 million.

150.   Defendants' conduct was despicable, malicious, wanton, fraudulent, oppressive and committed with a conscious disregard of Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish them and make an example of them.

## SIXTH CAUSE OF ACTION

## Unfair Competition Under California Business & Professions Code § 17200

(Against Bacardi Limited, Americana JV Investments and Kabalkin)

151.   Plaintiff incorporates the foregoing allegations as if set forth in full herein.

152.   Beckerman is a California resident and his equity in Stillhouse is California personal property.

153.   California's Unfair Competition Law, Business & Professions Code section 17200, *et seq.*, prohibits unlawful, unfair and deceptive business practices that

harm California residents and impair California property.

154.   The acts of Defendants as described herein constitute unlawful, unfair and deceptive business practices in violation of California's Unfair Competition Law.

155.   Beckerman is not the first entrepreneur and founder who has suffered from Defendants' scheme.  Bacardi has a pattern and practice of luring entrepreneurs and founders of spirits companies into trusting Bacardi and relinquishing control of their businesses to Bacardi, so that Bacardi can later squeeze entrepreneurs and founders and take the assets of the company they founded on the cheap.

156.   As a result of Defendants' unfair competition, Beckerman is entitled to equitable relief, restitution and an order disgorging Defendants' profits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants and for relief as follows:

1.    For compensatory damages, special and consequential damages according to proof, but believed to be in excess of $100 million;

2.    For punitive damages;

3.    For pre- and post-judgment interest;

4.    For costs and attorneys' fees to the extent permitted by law;

5.    For injunctive relief, and

6.    For such other relief as the Court deems just and proper.

DATED:  March 27, 2019

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Elena C. Norman*
Elena C. Norman (No. 4780)
Elisabeth S. Bradley (No. 5459)
Robert M. Vrana (No. 5666)
Rodney Square
1000 N. King St.
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
enorman@ycst.com
ebradley@ycst.com
rvrana@ycst.com

*Of Counsel:*

MILLER BARONDESS, LLP
Louis R. Miller
Christopher D. Beatty
David W. Schecter
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
smiller@millerbarondess.com
cbeatty@millerbarondess.com
dschecter@millerbarondess.com

*Attorneys for Plaintiff*